Okay, the next case before the court is 2010-98 Farring v. Allergan. Before we begin, I want to note that I just realized that of the six arguing counsel this morning, five are women, which makes me feel good. But in any event, we'll proceed with this case just after my commentary there. And Ms. O'Malley, I add my voice to your commentary. Oh, thanks. This is Judge Chen. I concur completely. Well, thank you, Your Honors. May it please the court. The district court's grant of summary judgment based on equitable estoppel in this case was improper for three reasons. The district court's application of equitable pre-issuance conduct was an abuse of discretion and is in conflict with this court's precedent. Number two, there were disputed issues of material fact for each of the required elements of equitable estoppel. And number three, there were undisputed facts pertaining to Dr. Fine's intentional copying of the statute. As a preliminary matter, a cause of action under 256 does not accrue until the patent issues based on the plain language of the statute. Judge Sweet's equitable estoppel finding was... Ms. Fork, this is Judge Chen. Yes. Do you think MCV is still good law? I think MCV is a pre-offerment case. I think it is sort of what I would call the exception to the rule, which is where you have, you know, equitable estoppel is an equitable doctrine. We must take into account the equities as between the parties. And in MCV, it was a very different factual situation in which there was affirmative misconduct, affirmative misrepresentations, the purported... But you conceded in your brief, I mean, while you're arguing that there may be different facts, but you conceded in your brief that yes, MCV does stand for the proposition that you can look to pre-issuance conduct. It does. I mean, unless this court overrules it, I don't know that it has been overruled. It is the exception where there is... So then we can't necessarily say that no pre-issuance conduct is relevant in an equitable estoppel case. I'm not saying that. I'm saying based on... Oh, maybe I misunderstood. Okay, go on. Yeah, because it sounded like you were arguing for a per se rule until you got to MCV and then sort of conceded that there can't be a per se rule. What I am saying is that when the scope of the issued patents are different than what was before the parties that led to the alleged misleading conduct or inaction, then the examination of a patent application, that's the precedent that was set forth in radio systems and John Bean. Can I ask you a question, a procedural question? When I look at your opposition to the motion for summary judgment, while there are arguments that it was that the dialogue back and forth, that you argue that there wasn't a complete, obviously, meeting of the minds on the issue, and that you didn't understand that Dr. Fine was talking about something beyond the sublingual administration route. I understand that, but I don't see anywhere that you really argued these legal points about pre-issuance conduct as never relevant. I do not believe that. Let me back up a minute. In the reference to the fact that the correspondence between the Fine and Ms. Barkley of Farring was sort of limited to the sublingual administration route and the enablement of low dosage possibilities thereby, and that was different from what the scope of the claims were that issued. I do believe there was an argument that was made in our opposition brief, and it's on page appendix 1163, that Allergan does not even attempt to argue that the letter in Exhibit 18, which is one of the Speranza letters, evidence a threat of formal action to correct inventorship, which is the substantive legal claim at issue here, nor could it, the statute and case law requires that a patent issue before it. So that was the extent of it that was in the opposition brief, and I believe was discussed in the facts that I referred to earlier in appendix 1148 and 1149, but the issue was recognized by the defendants in their reply brief when they submitted an Exhibit B where they compared the patent application claims to the patent claims. I'm not sure you understood my question. I'm saying your opposition brief almost is entirely based on the that Allergan couldn't prove its own reliance or prejudice. You do go into a discussion about the back-and-forth in the letters, but I don't see a legal discussion about this per se rule that you're proposing, or almost per se rule, that you can't consider pre-issuance conduct in the context of an equitable estoppel analysis. I do not believe that that issue was specifically addressed in the opposition brief. I believe radio systems was raised and argued that you had to look at each of the patents separately, but I do not believe that the legal issue that I'm raising right now was raised completely in the opposition brief below, but it was certainly the issue that the judge, Judge Sweet, made his decision on in his opinion, which is as he analyzed the law, he came down to radio systems and he states that he looked at the scope of the claims, but if you look at what was written in the opinion, what he states is, and this is an appendix 54, the low dosage invention as described in the PCT at issue in the Speranza correspondence is the same subject matter detailed in the patent in suit down to the specific numerical quantity of Desmopressin to be used and thereby he distinguishes it from radio systems. So that's the issue that we have on appeal, whether that was correct or not, and what we're saying is he erroneously analyzed, if he did, the scope of the claims. It seems to me from that language he was looking at the specification and the patents in suit and out. Well let me get to that near scope argument. I mean it's pretty clear that what the Judge Sweet found was that it doesn't, in his view, it didn't really matter what the scope of the claims were when the applications were provided to you in advance. So the question was what did you have, what you, there was silence in the face of what information, and I think his conclusion was there was a silence in the face of information that said these are the claims that we're going to assert. And isn't that the point he was making? Hello? Hello? In the correspondence, which is sublingual administration enabling low dosage possibilities, we had... About the application itself. Right, we had the PCT and the 100 application claims, which at that point in time we had told Dr. Fine that we were not relinquishing any claim as to ownership of any material that he may intend to include or claim later until we saw what he argued or presented for novelty and inventiveness. But you knew what was in the application, right? But the application claims are different in scope from what the claims are in the patents in suit, and that comes very clearly when we look at, for example, claim one of the 321 patent, which is at appendix 190, and that claim, first off, has no limitation as to dose. There is no low dose in that, and there is no reference to sublingual administration. And it is a method for inducing voiding postponement in a patient while reducing the risk that the patient develops hypernatremia, comprising delivering to the bloodstream of the patient an amount of desmopressin no more than about... But excuse me, counsel, I think you must have misstated because the application claims don't reference sublingual administration either. That's correct. What the application claims mention are low doses for pharmaceutical composition claims and low plasma concentrations, but what they don't... But you had those application claims in front of you, right? We did, but those are not the claims that issued in the patents in suit, and if they are... Inventorship is determined by the claims and element by element of the claims, and the elements that were ultimately claimed in the patents in suit are different. There were additional limitations directed to duration of action. There were claims directed to delivering to the bloodstream in the patient an amount of desmopressin of a patient. There were claims directed to... Ms. Bork, this is Judge Chen. I know right now in an oral argument that the Federal Circuit, you're going line by line through various patent claims and trying to compare them to the 2004 application claims. To what extent did you argue any of this line item type arguments to Judge Sweet below? That issue was not specifically argued, but the issue was before him. That the patents in suit were different from what the invention that was claimed by Dr. Fung. Where's that in the briefing in front of Judge Sweet? It's on the I read that to say that the patent claims ended up being different than the ones that were first discussed in the earliest correspondence going back and forth. The sub-legal administration claims, but I don't see any argument that the patent claims actually differed in material ways as it relates to this issue. Not as it relates to whether there's some other issue that could be presented, but as it relates to the estoppel issue, I don't see any argument that the application that was submitted to you was stuck to the sub-legal administration route. That statement that I referred to in our opposition brief was addressed by the defendants in the reply brief, and that's where they addressed exactly this issue, the scope of the claims in the PCT and the 100, the pending applications with the scope of the claims in the patents in suit, and submitted an Exhibit B to their brief, which of course we could not respond to because it was the reply brief. But it certainly was, the issue was before Judge Sweet, and he was aware of it when he wrote his opinion because the case was actually presented in at least the reply brief of the defendants. So there was no surprise on that. Let me ask you, you know, I understand that we are facing this record. We can't consider all the things that were submitted in more detail in the later record, but what is the impact of the decision that you submitted to us in the 28J letter? So that decision found that the claims, all claims in two of the patents that are at issue in this case, were invalid for three different reasons, written description, enablement, and 102F. That decision, however, is not final. I am told by defendants that they intend to appeal that decision. So this decision is, this Judge McMahon, Chief Judge McMahon's judgment of invalidity is overturned in all respects. Then it is always been, and has been, Farring's position that these patents contain Farring's work, and they should not be allowed to be used as a sword against Farring when they were our work, and he derived the information from us. So that to the extent that the patents are valid, we have always taken the position that they are ours and they belong to us. This is Judge Chen. I've got a quick follow-up question. To what extent do the claim scope from the Farring patents overlap with the claim scope of these three Dr. Fine patents? The Farring patents were directed to pharmaceutical compositions. They related to an orodispersible dosage form. They are different from the Fine patents, which these are directed to methods of treating individuals with a dose of Desmopressin to achieve certain functional limitations, functional pharmacokinetic and pharmacodynamic limitations. So they are different, and Judge Costell, in this case, has already found that Dr. Fine is not an inventor or a joint inventor on Farring's patents. I can see my time is running out. I would just like to emphasize one other important thing, and this is very important because this is an equitable doctrine. There was undisputed facts that were submitted by Farring to the district court showing Dr. Fine's intentional copying of Farring's work, and which were, and they can be found at Appendix 1172 through 1206. They were accompanied by a declaration from Dr. Danhof, and that's at Appendix 1473 to 1514. So that intentional copying by Dr. Fine was not addressed by Judge Fleet. But you were aware of the copying back in 2004, isn't that right? No, no, no. I thought Farring's counsel, Mr. Speranza, you know, gave you a copy of the CIP application in addition to the PCT application. So, and then he proclaimed to Farring's counsel that everything in Example 8 was Dr. Fine's work. And so that gave you the opportunity to see that and understand whether you agreed or disagreed with that. My understanding as to what occurred was it was not until there were documents produced in corresponding litigation in the Netherlands, where we found out that Dr. Fine had access to and had Farring documents in his possession, and that he had, in fact, copied Farring's clinical trial, CS009. He had taken that protocol and copied it and re-ran it as his own and submitted that data to the Patent Office as Example 8 and represented it as his own. Those facts did not come to us. We were not aware of those facts in 2004. Can I just ask one question on that? Wasn't it a Farring employee who sent Dr. Fine the CS009 protocol by email? How can Farring say they weren't aware of it? Well, what happened was a Farring employee, Farring workers in Copenhagen drafted the CS009 protocol. They sent it to Dr. Fine for him to execute it here in the U.S. Dr. Fine was shortly after that, when the results were published, or once he had unblinded and knew the results, he was fired or terminated. What was not known to us until later was that he had taken Farring documents with him and he had actually copied the Farring protocol to re-run his own study. We were not aware that he was, during the entire time of the forensic correspondence, we were not aware that he was running these two proof-of-concept studies, that he had CNF, to repeat the work that was done at Farring and to use it in his patent application. That was never brought to our attention at any time in that period. Here's my final question. What I'm trying to understand is why, in December 2004, after Mr. Speranza sent his two letters explaining Dr. Fine's position that that he is the true inventor of everything that's being claimed in these two patent applications and this is his work, it's not any of Farring's confidential information, and so he really plants his flag in the sand with this proclamation, and why doesn't Farring ever write back? I don't know the answer to that other than to say that what preceded that was Farring's counsel saying, we cannot now say that we will not ever challenge ownership or inventorship until we see whether or not you get any claims will be allowed. It was Farring's position. Well, as I understand it, that one letter said, well, of course, we don't know until we see the content of the application, until we see the text, and now in 2004, you plainly saw the text of both applications and then said no more after Dr. Speranza made his proclamation. So I'm just trying to understand what is the plausible alternative reading of that other than, well, seven years of silence, it was very, very reasonable for Dr. Fine to believe that Farring was walking away from this and not going to bother Dr. Fine in his attempt to get patents and everything else. I think it's quite clear that we reserved our right to challenge inventorship depending on what claims ever issued. It was also clear that we didn't believe that what Dr. Fine said he was pursuing patent protection for, sublingual administration enabled by low dose would be patentable. We did not believe low dose in and of itself was a patentable invention. And so therefore, we had to wait. We could not bring a cause of action. We had no recourse at that time. There were no issued patent claims. So we made our position clear that we were still reserving our rights to see what he did and what claims that ultimately became allowed. And until we had issued patent claims, we couldn't bring a cause of action under 256. And quite frankly, remember, the important thing here, this was a grant of summary judgment. And in those circumstances, the evidence must be perceived in the light most favorable to Farring. And inferences must be drawn in Farring's favor, not against it. And it is our position that Judge Sweet, quite frankly, drew inferences against Farring. And the evidence was not perceived in the light most favorable to to present the evidence to the court with a full record, which I think is what Judge McMahon said in her footnote 11 in her opinion that she recently issued, where she said, I now, knowing what I know now, not so sure I would have agreed with that decision. And I can see I'm way over my time. Okay. We'll give you two minutes for rebuttal, counsel. Thank you. Ms. Spires? Hello? Sorry, Your Honor. I stayed on mute. The purpose of the doctrine of equitable estoppel is well laid out. As you all have mentioned, this court held in MCV that it is impermissible for a party to lie low for four years and then invoke a claim of erroneous inventorship against the patent when the matter could have been resolved from the start. And that is the case whether the misleading conduct occurs prior to the patent issuance as it did in MCV or otherwise. And that's exactly what Farring did here. Ms. Spires, this is Judge Chen. I just want to try to understand the larger landscape here and what's in play, because now we have this equitable estoppel decision here to correct inventorship. But at the same time, now we have the district court's decision after a trial finding at least two of these three patents invalid for, among other reasons, failure to correctly identify the inventor. Is that right? That's correct, Your Honor. And what is your plan? Your plan is to appeal that decision? Yes, Your Honor. We are going to appeal that decision. And I would like to note a misstatement related to this in Farring's reply brief. It said that we misstated the decision when we said that Judge McMahon had said that Farring was not allowed to pursue his declaratory judgment claims for inventorship and that she had reversed herself on that issue. She actually did not. She reversed herself on the issue of she saw a distinction, whether correct or not, and that will be an issue for appeal. But she saw a distinction for an actual claim for correction of inventorship, 256 claim versus defenses. And while she applied equitable estoppel to Judge McMahon's decision and so did not consider Farring's 256 claims, she did consider Farring's defense. But I will note that in that case, although she did, in our opinion, wrongly, but you guys will see that opinion come to you soon enough, determine that two of the three was the inventor. And so the case that Farring's trying to bring here, even in Judge McMahon's decision, they did not win. Well, she didn't correct inventorship, but what she said is that Dr. Fine either wasn't the inventor or to the extent that he was an inventor, he wasn't the sole inventor. So she did find that the patent was invalid because of improper inventorship, correct? She did. She did find... What does it matter if it's not a Farring employee that's been left off? Well, for this particular action, this was a 256 action to correct inventorship, not an action to invalidate the claim. And so for correcting inventorship here, in this case, what Farring was trying to prove was that its employees were inventors. They were not trying to invalidate the patent. They were trying to get the patent. And so the distinction matters there. Even if you're going to appeal that, you've got an uphill climb because you would have to establish that Judge McMahon was wrong on everything, written description, enablement, and inventorship. So given that, why shouldn't we hold this case in abeyance, pending consideration of that case on appeal to see if there's anything even left of this patent? Well, in all honesty, if your honors wanted to do that, you could. I think there's nothing improper about holding this case in abeyance to see if there is anything left. However, there is in this case, the one problem that would resurface no matter what is the third patent. That's my follow-up question. So what is different about the third patent as it relates to the specific factual findings and the other determination? The third patent has quite a few claims that Farring has never claimed ownership of and that Judge McMahon never looked at to determine whether Dr. Fine was the inventor. And so that one would have to be decided on its own in another case. That was not asserted against Farring in the other litigation, which is why it was not at issue here. And one point that I would like to make, I know you mentioned that it would be an uphill battle. In our view, when you all see the record and you see that Judge McMahon came in honestly with her mind already made up and said, pardon the language, it's a direct quote from Judge McMahon, that she came in with an opinion from Judge Castell saying that Dr. Fine was lying his expletive off and said that on the record. It was clear that her mind was made up and she did not approach the case as a neutral impartial fact finder. And so in light of that, I think when one domino falls, the rest will fall in terms of showing that Judge McMahon's findings were improper in that case. Okay. I do agree with counsel's statement earlier that the scope of the Farring patents that you all are different than the scope of the patents at issue here. And that is one of the reasons that the Castell opinion that Judge McMahon relied on so heavily should not have influenced her the way it did. Well, each case just has to be decided on its own record, but she also heard testimony, correct? She heard from the same people. She did, but she said in closing argument that she came into this case with an opinion from Judge Castell that said that Dr. Fine is lying his expletive off. And so that she admitted that that's how she came into the case and she wanted to prove otherwise. She was just looking for us to prove otherwise. And so that is not deciding the case on its own record by any means. Well, I mean, she developed the full record to give you an opportunity to show that Judge Castell was wrong, right? I mean, it's kind of shocking what you're accusing her of. It's kind of surprising. And I appreciate that, Your Honor, but I'm giving you a direct quote of what she said, deleting the expletive. I'm sure there's some other context that we'll hear about. It was actually shocking to us, the way that she approached this case. We were shocked as well, I assure you. Okay. Does that have anything to do with enablement or written description? We believe that everything rails and fell together. Yes, Your Honor. That everything was approached with a very biased mindset. I want to address the copying. It was a glaring omission from Judge Sweep's opinion. It doesn't even mention the copying in its actual recitation. How do you get around that gap in the equitable analysis? Well, because of the purpose of an equitable estoppel. What Farring says in its opening brief at page 50 is that the evidence of unclean hands is that Dr. Fine, quote, incorporated the data into example eight of the fine patents and intentionally misrepresented it as his own original work by claiming he was the sole named inventor. That is the inventorship dispute. That is the dispute that equitable estoppel is designed to foreclose. If we're getting into the inventorship dispute as to whether or not Dr. Fine was the sole named inventor of what he included in his patent, if that counts as unclean hands, then there's no purpose for equitable estoppel. Equitable estoppel is applying to an inventorship dispute that you're going to have someone that is representing that they are an inventor and there's a dispute about that. So if we're getting into the facts of the dispute, then we're getting into facts that are foreclosed by equitable estoppel. And I think that Judge Sweep was correct in saying that he had considered that evidence and did not find it persuasive. It's not a situation where they're saying, you know, okay, this same information in this patent where you've got like an interference where both parties say that they invented simultaneously. This isn't, it's not a question of whether there's similarities between the two. It's a question of whether he actually took documents that didn't belong to him and copied a protocol for purposes of testing. Now I understand he says I did my own tests afterward, but I think that's a different circumstance than the one you're saying that says would make equitable estoppel always apply. Respectfully, what opposing counsel represented are the facts actually are not the facts. There is nothing in the record here or frankly in the trial that we just conducted, which has a much fuller record. There is nothing in the record that Dr. Fine took Faring's documents with him, copied them, and conducted this test again. What, frankly, is not in the record here. What did Judge McMahon find? Didn't she find that? Not that he took the documents with him, no. The facts are that Dr. Fine was the author of, or was one of the authors of that protocol. And so he had the Covance Clinical Research Unit, which is what is in evidence here, that he outsourced the, or contracted with the same outside research organization to perform the studies. And so that outside research organization, Dr. Fine gave, or someone at his organization sent the protocol, which Dr. Fine was not under any confidentiality obligation, which is in the trial testimony there. But again, none of that is in the record here, which is why counsel's representations about all of these, how they found all of this, is entirely improper in this case. That is not in the record, and that was not in the record before Judge Sweet. That's what counsel's been trying to do this entire time today, is talk about facts that they did not bother to put into evidence. They want to say now that there's a disputed fact issue about this and about that, about the scope, about unclean hands, but they did not make a factual issue because they did not put that evidence in the record. All the evidence that they put in the record before Judge Sweet, it was very minimal in fact, and it was that there were similarities between the two studies, acknowledging that both studies were done by the same outside research organization who likely has the same template, and then they also acknowledged that Dr. Fine's example 8 was based on another study, PK 2004-01, which Faring has never alleged has any similarity to any study Faring conducted. And so this example 8 that is the part of Dr. Fine's patent does not have, well, we will give that there are similarities between one of the studies that led to example 8 and studies conducted at Faring. There are additional studies that went into example 8, and all of the data that came from example 8 was the property of Dr. Fine and CNS Pharma. They did not use the data from Faring to come up with example 8. But the protocols were nearly identical, were they not? They were nearly identical, yes, Your Honor. For the 2003 protocol, the CNS-009, the other protocol that was the PK 2004-01 was not, and that's the one that Faring omits in its discussion. And as Your Honor has mentioned, this is something that Faring had in its possession in 2004. So whether or not they thought there was an issue about unclean hands, the fact that they sat on that, it's the same problem. They're sitting there saying, okay, we're going to lie in wait and allow our competitor to do this, and then maybe we can swoop in and take the competitor's patent. They knew in 2004, as Your Honor has mentioned earlier, that Dr. Fine had this protocol. They emailed it to him. So they knew that he had had this protocol, he'd used it. So that was not a secret. They knew the data in example 8, and they could see what was done in the protocol or in the patent, and they could see what the data that Dr. Fine came out with. If they wanted to come up with any inventorship argument or any other here, it was incumbent upon them to do so. As this Court has held in MCV, an assertion of right followed by silence can give rise to equitable estoppel. The fact that Faring may have objected at one point in 2003 saying, well, there might be additional subject matter, that is rendered moot when in 2004 they see the claim. As Judge Reyna has discussed in his concurrence in 4 v. 2, it actually is the case that where is here, the scope issues that counsel talked about earlier, the only differences in scope between the patent claims that Dr. Fine had sent to Faring at the time in 2004 and the issued claims are additions to claims. And what Judge Reyna's in 4 v. 2 is that if claims are narrowed during examination, the scope of the patent here or limitations are added, the scope of the patent becomes narrower, not broader. And shrinking patent scope does not give rise to previously nonexistent inventorship claims. So since an inventorship claim from the very beginning, there is no rational reason to wait until the patent issues. Are you, Ms. Byers, this is Judge Shen, are you saying that when you add limitations, those limitations can never be separate inventive concepts? And so therefore there's no basis to as far as to say never. I think what Judge Reyna said correctly in her concurrence was that shrinking patent scope does not necessarily give rise to previously nonexistent inventorship claims. And I think here we are in the case where it did not give rise to previously nonexistent inventorship claims. And as your Honors has mentioned earlier, Faring did waive that issue. They have never gone line by line or done anything more than about a two-line summary saying that the patent claims were different in scope until their reply brief. In your summary judgment paper below, your opening summary judgment brief, we don't have a copy of that in the Joint Appendix. Did you in fact say in that brief, hey, look at the claim scope of our 2004 application claims versus our subsequently issued patent claims. Same claim scope, same subject matter. So therefore, Faring was completely on notice and relinquished any rights to the ultimately issued patent claim scope because they had full notice of that very claim scope in the content of our 2004 application. Does your summary judgment brief say anything like that? Your Honor, I believe it does. But to be honest, right this second, I can't confirm that for certain, but I can submit a letter brief if that would be helpful to the court to provide that information later. Well, can you submit the summary judgment, the full summary judgment briefing from the parties because much of it is heavily redacted on that district court docket? Yes, your Honor. We'd be happy to do that. Getting back to the 2004 colloquy between Barclay and Speranza, is it possible to read Barclay's opening December 2004 letters saying, hey, you have some information in this PCT application that is Faring's proprietary and confidential information. So that really bothers us and it surprises us that you went and did that, Dr. Fine. And then Dr. Fine says, no, no, that's not confidential at all. Is that enough to say that on summary judgment necessarily Faring took an act that basically abandoned the claim scope that was contained in the 2004 applications when Ms. Barclay never actually said the claims that you have drafted in these 2004 applications belong to Faring, not Dr. Fine. We are the inventors, not you. Given the absence of a statement like that, can we really say that there's no reasonable inference that the Barclay letter wasn't necessarily about inventorship per se, but really more just about some information it believed was proprietary information to Faring, which is a different question than inventorship. Your Honor, I don't think that's a permissible reading. As you're aware, I'm sure, this court has held many times that when there is a threat of action, of immediate legal action and then silence, that that is sufficient to constitute misleading conduct. And here, there is no possible reading that that is all that Dr. Barclay was referring to. If you look at her letter, it's a short letter, Appendix 544, and in one sentence, she gives the issues. And she gives two issues, not one. And she says that she was surprised to see Dr. Fine had proceeded with this application containing an invention to which we believe he has no entitlement and which in particular discloses information confidential and proprietary to Faring, like you're talking about. So, two issues with the conjunctive and. And then the next paragraph says Faring will take all necessary steps to protect its rights and interests. And it goes on, if I do not receive a full, and that word is key, and satisfactory explanation within 14 days of this letter, we will commence formal action. There is no reading that an issue, that a response that only addresses one of only two issues discussed in this short letter could be a full explanation. So, she is threatening immediate legal action within 14 days if she does not receive a full explanation. And full meaning, that can only mean addressing both issues that are discussed. The issue before the and, which is the inventorship issue, and the issue after the and, which is the confidential information. Okay. So, where is the inventorship issue? Because she doesn't exactly say the word inventorship. She says that application containing an invention to which we believe he has no entitlement. And then if we look at Dr. Fine's interpretation of this, and I believe your honors will recall that Dr. Fine's interpretation of this is key. In the Wafer-Shafe case, this court held that you look at this from the perspective of the person asserting equitable estoppel. So, from Dr. Fine's end, and at Appendix 546, addresses this issue and the belief of no entitlement and says at the bottom of that page, if your characterization is somehow intended to suggest that Dr. Fine is not the inventor of the claimed low-dose invention and or that Dr. Fine cannot assert ownership rights to it, we respectfully yet emphatically disagree. Our dealings and communications throughout 2003 has made clear, and he goes on, and he talks about that his email prior had said Dr. Fine was proceeding with his patent application for low-dose desmopressin with the understanding that Faring relinquishes any ownership claims to. And that's key, because that is Dr. Fine showing Faring that he is relying on their representation here, that they have relinquished ownership claims to this. Well, to me, one alternate reading of these two letters is that Dr. Fine cannot be sure and cannot tell exactly what it is that Ms. Barclay intended with her very short, brief letter. And so, maybe it's possible that this short, brief Barclay letter isn't necessarily devoted to an inventorship claim of saying that all patent rights on these claims belong to Faring. I guess that's the concern I have as to whether this is something that can be kicked off on summary judgment. Well, your honor, I respectfully, because this correspondence was conducted quite a while ago, and I know Dr. Ferranza has since passed away, this record is not going to be any more fulsome than it is here. And so, it's not going to be any better later. But what she said, and what Dr. Fine references here, is that the next sentence on Appendix 547 is that in your responsive letter of April 29th, you confirm that Faring would not be pursuing any claim with respect to low-dose dosimopressin while reserving possible claims as to ownership only of any other material Dr. Fine may include in his patent application. By this time now, Faring is on notice that this is what Dr. Fine believes, and believes this based on their own representation, that they were not going to pursue ownership of anything that Dr. Fine has claimed, and only of any other material. And this is exactly the MCV case, which is that... But wouldn't you agree... I'm sorry. Oh, wouldn't you agree... Go ahead. You go ahead. I was just going to ask, this statement in the Speranza letter, summarizing the Barclay April 29 letter, wouldn't you agree that's actually a misstatement of it? Because that April 29 letter never said that Faring would not be pursuing any claim with respect to low-dose dosimopressin. It said that Faring wouldn't be pursuing any claim for sublingual administration, enabling a low dosage of desmopressin. So it wasn't just this blanket statement that Faring is going to be out of the business on any form of a low-dose desmopressin. It was a very specific form, sublingual administration. Isn't that right? Respectfully, no. That letter is at Appendix 542. And when Faring is talking about sublingual administration, the second paragraph of that is in the public domain. And so they said that the low dosage possibilities enabled by the sublingual administration route. So they're talking about both low dosage possibilities that are enabled by the sublingual administration route. So there's kind of a mixture here. And that's fairly broad as to what is enabled by the possibilities enabled by the sublingual administration route. But said those are available in... Those are linked, right? It's a sublingual administration that enables a low dosage possibility. Correct. That's what they are talking about being in the public domain. And here they're not talking about the entirety of Dr. Fine's invention, which he had given a much more fulsome explanation as to what his invention was in his initial communications with them in November 2002. But at this point, they're talking about what they believe is in the prior art and the... Apologies on the pronunciation, but the Fjellstad-Polson's doctor's thesis published in 1996. And so for that, that is what they're talking about with respect to sublingual administration. But then they're saying they cannot, of course, say now that Faring will not make any claim as to ownership of any other material Dr. Fine may include in any patent application without seeing the text. Correct. The November 2002 letter, it goes directly to what Judge Ken was talking about. It says it asserted his inventorship because it added something important, particularly a sublingual transmucosal route of delivery. So, I mean, it was... He was saying that that's where he contributed was the sublingual administration, right? Respectfully, in the letter, it said, at appendix 49, that Dr. Fine asserted that he invented a sublingual transmucosal route of delivery, which is broader than just sublingual, which affords a number of advantages, including enabling the effective use of formulations, having reduced concentrations of desmopressin. And that's where a lot of these inventions come in, the effective use of formulations that have reduced concentrations. And that's what Dr. Fine does ultimately end up claiming. And so what Ms. Barclay states in this letter is that she can't say at that time whether they're going to make any claim of ownership of other material. But then, by the time she makes her threat, she has all of the information of what all of the other material is that Dr. Fine is claiming. She has his statement in his letter that he is relying on the understanding that Faring has relinquished any ownership claims to, and his interpretation of her statement. And in light of the fact that she is the one that made the threat, she was in the driver's seat of her letter. She made the threat. He responded and is showing very clearly, laying his cards on the table, saying, this is what I am relying on. This is my interpretation of your letter, which under wafer-shave is the perspective that must be relied on. And he's saying, this is my interpretation of your letter. It is now incumbent upon her, under wafer-shave and MCV, to not be silent. And he was. Okay. Okay. Thank you, Counsel. We've gone way over time. Thank you, Your Honor. Got to hear from Ms. Bork again. Sorry. Thank you, Your Honor. I will be brief. Can I first start where we just left off? I mean, do you agree that sublingual transmucosal route of delivery is much broader than sublingual route of delivery? I agree that transmucosal route of delivery encompasses more than sublingual, yes. Okay. So, how do you respond to that, that right in the very beginning, he was actually saying that his contribution was broader than just sublingual route of delivery? Because he ultimately claims far more than just transmucosal routes of administration. He claims, let me get my claims. He claims conjunctival, he claims subcutaneous intravenous, transdermal, intradermal, etc., etc., etc. So, yeah, what he claims is far broader than what he claimed his invention to be. And even if you look at his declaration that he submitted in support of the summary judgment brief, which is Appendix 1122, he still describes his invention and what he relied on as claiming a low-dose desmopresent or desmopresent adapted for sublingual administration. He believed that Therrien was aware of my application and would not dispute that I was for sublingual administration inventions. What he claimed is far broader than that. So, let me just say this. At a minimum, the arguments here have shown that there are disputed issues of fact that summary judgment was improper. As to the forensic correspondence, there are inferences that can be drawn as to what was being discussed there in terms of entitlement. What was the threat of action? Was that related to the stealing of confidential information? It could not have been an action for correction of inventorship because that cause of hands and copying. The other side, you just heard them say that you're trying to create fact questions that you didn't actually present below. And so, therefore, you don't really have a leg to stand on with your specific accusations about copying. In your opening argument, you tried to very broadly cite chunks of the JA, but do you have something a little more specific? I can be quite specific, Your Honor. What I'm referring to is a section called... It begins, the cover page is Appendix 1172. It's Barrien's response to Defendant's Rule 56.1 statement and statement of additional material facts. What's the pinpoint? Do you have a pinpoint? Do you have a paragraph number? I... Well, it starts on 1204 with the Roman numeral 3 heading, and it is all of the evidence that goes through to Roman numeral 4. In addition, there is a declaration from Dr. Danhoff, which he has... Well, that begins at Appendix 1473, but at Appendix 1499, he has an entire section, Roman numeral 6, that goes quite some pages about the copying of the CS009 study. It goes all the way to, well, excuse me, 1514. And what I would say is that those facts and Dr. Danhoff's declaration was never responded to by the defendants below and was never addressed by the courts. Those are clearly disputed facts. They are clearly something that we should have been able to present for the trier of fact. It goes to Dr. Fine's reliance, and was it reasonable or not? Because if he has bad faith, and he has his own misconduct, and he's utilizing data, not data, protocol, rerunning it, submitting his data, representing it as his own to the Patent Office, utilizing that data to add additional claim limitations, including the duration of action to his patent claims, it's highly material to whether or not equitable estoppel was even proper on a motion for summary judgment in this case. And I would also say that I think this court's precedence, when it talks about misleading conduct in terms of silence, there generally is, there's got to be something more. It's just not silence. There has to be some course of dealing between the parties where there was some sort of expectation that they would speak up or some sort of affirmative misrepresentation during that silence period. Before you sit down, can I ask you about the 761 patent? What is different about that patent in terms of these specific facts for purposes of our analysis here? Well, I would say that 761 patent also includes the same duration of action time limitations. These are additional claims that were added. They're claims 13 to 17. So again, this is different than what was ever presented in the pending applications. And the route of administration is not transmucosal, it's intranasal, transdermal, or intradermal. So different routes of administration. Okay. Any last words? No, I thank your Honor for the time. I would just say that I do not believe waiver exists here under this court's precedent. And I have Fizer v. Lee, 811, Fed 3rd, 466. I'm sure that the lower court be fairly put on notice as to the substance of the issue. Here, it cannot be disputed that the district court was put on notice of the substance of the issue because that was the central focus of part of his finding on misleading conduct. And I don't have anything further. Thank you for your time. Okay. Thank you. The case will be submitted.